# UNITED STATES DISTRICT COURT

## STATE OF NEW JERSEY

| | | |
|---|---|---|
| MICHAEL RUBIN, On Behalf of Themselves and All Other Similarly Situated, | ) ) ) | Case Number: _____ |
| Plaintiffs, | ) ) | CLASS ACTION |
| v. | ) ) ) | COMPLAINT |
| SEACUBE CONTAINER LEASING LTD., JOSEPH P. ADAMS, JR., JONATHAN G. ATKESON, JOSEPH S. KWOK, PAUL R. GOODWIN, DOUGLAS A. HACKER, DONALD P. HAMM, and MARTIN TUCKMAN, | ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Michael Rubin ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, the following against Defendants (defined below) based upon, among other things, a continuing investigation conducted by and through his undersigned counsel into the facts and circumstances alleged herein, including, without limitation, review and analyses of: (i) the public filings of SeaCube Container Leasing Ltd. ("SeaCube" or the "Company"), Ontario Teachers' Pension Plan Board ("OTPP"), 2357575 Ontario Limited ("Ontario Ltd.") and SC Acquisitionco Ltd. ("Acquisition Sub"), with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, public statements, news articles, and other publications disseminated by or concerning SeaCube, OTTP, Ontario Ltd., Acquisition Sub, the Proposed Transaction (defined infra); and (iii) the corporate websites of SeaCube and OTTP.

## SUMMARY OF THE ACTION

1.     This is a stockholder class action brought by Plaintiff on behalf of himself and other public stockholders of SeaCube against SeaCube and its Board of Directors (the "Board"). This action arises out of Defendants' pursuit of a sale of the Company to Ontario Ltd. and Acquisition Sub, affiliates of OTPP (collectively "Ontario"), at an unfair price and pursuant to an unfair and self-serving process (the "Proposed Transaction"), which "oppressive" conduct against SeaCube's stockholders violates section 111 of the Bermuda Companies Act of 1981. In addition, the Board filed with the U.S. Securities and Exchange Commission ("SEC"), and disseminated to SeaCube stockholders, a false and materially misleading Preliminary 14A Proxy Statement (the "Preliminary Proxy"), which violates sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 14a-9 promulgated thereunder ("Rule 14a-9"). .

2. On January 18, 2013, Ontario and the Company announced a definitive Agreement and Plan of Amalgamation (the "Amalgamation Agreement") whereby Ontario, through its affiliates, will acquire all outstanding shares of SeaCube for $23.00 per share in cash ("the Amalgamation Consideration"). The Proposed Transaction has an approximate aggregate value of $469 million. It is expected to close in the first half of 2013 and is subject to certain regulatory approval.

3. Since 2006, Fortress Investment Group LLC ("Fortress") has been a large stockholder of SeaCube – at times its majority stockholder – and has used its significant ownership stake to stack the SeaCube Board with Fortress employees, business associates, and other loyalists. As set forth below, at least 5 of the 7 members of the Board have significant ties to Fortress or senior management and, as a result, did not focus solely on obtaining the highest possible price in connection with the sale of SeaCube.

4. Despite its bright prospects as a standalone company, following numerous indications of interest from potential buyers during the first half of 2012, the Fortress-led Board jumped at the opportunity to sell the Company and monetize its investment in SeaCube. From the outset, the Board immediately locked in on a sale of the Company and never explored other strategic opportunities, such as remaining a standalone company. To this end, the process was started, driven, and finished by conflicted Company insiders, initiated by the Fortress-loyal Board and led by the Company's Chief Executive Officer ("CEO") Joseph Kwok ("Kwok").a The Company's Board and Defendant Kwok sought – and have achieved via the acquisition – an opportunity to cash out their holdings to the detriment of the other public shareholders of the Company. While Kwok and certain other members of SeaCube management secured employment going forward post-acquisition, the Fortress-dominated board achieved a liquidity event for their otherwise illiquid holdings in the Company.

5.     Notwithstanding the obvious conflicts of interest on the part of management and certain of the Company's inside stockholders, the Board made no effort to erect prophylactic measures to ensure that the interests of the Company's public stockholders were adequately protected during the sales process.  The Board failed to set up a "special committee" of independent directors to oversee the sales process, allowing clearly conflicted third-party financial advisors Merrill Lynch, Pierce, Fenner & Smith Inc. ("BofA Merrill Lynch") and Deutsche Bank Securities Inc. ("Deutsche Bank") to conduct the sales process.  Eager to cash out, the Fortress dominated Board made no effort at all to engage itself in the sales process. Instead, the Board was disengaged and consciously disregarded its duty to maximize stockholder value, allowing Defendant Kwok to lead the sales process and negotiate on behalf of his own interests.

6.     Knowing Fortress was looking to monetize its SeaCube investment, Ontario secured the support of the Company's CEO Defendant Kwok, Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") Stephen Bishop ("Bishop"), and General Counsel Lisa Leach ("Leach") by promising them lucrative employment upon consummation of the Amalgamation since Ontario will be retaining SeaCube's current management and will operate the Company as a standalone business, post-acquisition.   Moreover, Defendant Kwok and Leach, will have an opportunity to invest in the new company on top of guaranteed equity options.  Since the Board is comprised almost entirely of members of Fortress and other Fortress loyalists, it was not going to stand in the way of Fortress management's preferred deal, even if the deal stripped stockholders from enjoying the benefits of the Company's ongoing success.  In contrast, Company insiders such as Kwok and Leech will continue to share in those benefits

7.     Furthermore, after acceding to the wishes of the Company's largest stockholder and senior management team in approving an unfair sale, the Board gave Ontario a myriad of

oppressive deal protections which serve to ensure the consummation of the Proposed Transaction. These deal protections include a $15.5 million termination fee, four-day matching rights in the unlikely event a higher bid is made, and a no solicitation provision. Furthermore, SeaCube's largest stockholder, a Fortress affiliate, has already entered into a Voting Agreement and locked up 42% of SeaCube's shares in favor of the Proposed Transactions.

8.    On January 30, 2013, the Company filed its Preliminary Proxy with the SEC in order to secure stockholder support for the Proposed Transaction, which contained numerous material misstatements and omissions. The Preliminary Proxy fails to disclose, *inter alia*, material information concerning: (a) the sales process and background of the Proposed Transaction; (b) details concerning the involvement of SeaCube's financial advisors BofA Merrill Lynch and Deutsche Bank; and (c) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinions" provided by BofA Merrill Lynch and Deutsche Bank.

9.    As explained herein, the above omitted information is material to the impending decision of SeaCube stockholders whether or not to vote in favor of the Proposed Transaction. As such, Defendants' violations of sections 14(a) and 20(a) of the 1934 Act threaten stockholders with irreparable harm for which money damages are not an adequate remedy. Thus, Plaintiff seeks injunctive relief to ensure that Defendants cure their violations of law before SeaCube stockholders are asked to vote on the Proposed Transaction.

10.    To remedy the Individual Defendants' misconduct, Plaintiff seeks, *inter alia*: (i) injunctive relief preventing consummation of the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for stockholders, and defendants disclose all material information concerning the Proposed Transaction to SeaCube stockholders; (ii) a directive to the Individual Defendants

to obtain a transaction which is in the best interests of SeaCube stockholders; and (iii) rescission of, to the extent it has already been implemented, of the Amalgamation Agreement or any of its terms.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under sections 14(a) and 20(a) of the 1934 Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) SeaCube maintains its principal place of business in this District; one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.     Plaintiff, Michael Rubin, residing at 1625 East 10th Street, Brooklyn, NY 11223, is, and at all times relevant hereto has been, a SeaCube stockholder.

15.     Defendant, SeaCube, a Bermuda corporation, has at all relevant times maintained its principal executive offices at 1 Maynard Drive, Park Ridge, New Jersey 07656.  SeaCube is one of the world's largest container leasing companies based on total assets.  The containers it leases are among the primary means by which products are shipped internationally, facilitating the secure and efficient movement of goods via multiple transportation modes, including ships, rail and trucks.  The principal activities of the business include the acquisition, leasing, re-leasing and subsequent sale of refrigerated and dry containers and generator sets.  These leases are primarily under long-term contracts to a diverse group of the world's leading shipping lines.  SeaCube common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BOX."

16.     Defendant Joseph P. Adams, Jr. ("Adams"), C/O Fortress Investment Group LLC, 1345 Avenue of the Americas, New York, NY 10105, has served as the Company's Chairman of the Board since joining the Board in March 2010.  Adams is a Managing Director at Fortress within its Private Equity Group.

17.     Defendant Jonathan G. Atkeson ("Atkeson"), 380 New Rochelle Road, Bronxville, NY 10708, joined the Board in March 2010.  Atkeson is a Managing Director at Fortress in its acquisitions area.

18.     Defendant Joseph S. Kwok, ("Kwok"), 1500 Newell Avenue, Suite 600, Walnut Creek, CA 94596, joined the Board in March 2011 and has served as the Company's Chief Executive Officer since March 2010.  Kwok is the Chairman of the Board of SeaCastle Inc., a Fortress affiliate.

19.     Defendant Paul R. Goodwin ("Goodwin"), CSX Corporation, 901 E Cary Street, Richmond, VA 23219, joined the Board in October 2010 as a designee of Fortress.

20. Defendant Douglas A. Hacker ("Hacker"), P.O. Box 66100 – WHQLD, Chicago, IL 60666, joined the Board in October 2010 as a designee of Fortress.

21. Defendant Donald P. Hamm ("Hamm"), 29 Hamm Road, Hudson, NY 12534, joined the Board in October 2010 as a designee of Fortress.

22. Defendant Martin Tuchman ("Tuchman"), 633 Prospect Avenue, Princeton, NJ 08540, joined the Board in March 2011 as a designee of Fortress.

23. The defendants named above in ¶¶17-23 are sometimes collectively referred to herein as the "Board" or the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of SeaCube stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant, and the immediate families of each of the Individual Defendants.

25. This action is properly maintainable as a class action.

26. The Class is so numerous that joinder of all members is impracticable. According to the Company's Preliminary Proxy, as of January 29, 2013, there were over 20.28 million shares of SeaCube common stock issued and outstanding.

27. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a) whether the Proxy contains material misstatements or omissions in violation of sections 14(a) and 20(a) of the 1934 Act;

(b)     whether the Individual Defendants have oppressed SeaCube stockholders in connection with the Proposed Transaction by: (i) failing to take steps to maximize the value of SeaCube to its public stockholders; (ii) failing to properly value SeaCube and its various assets and operations; and (iii) ignoring and not protecting stockholders against their conflicts of interest; and

(c)     whether Plaintiff and the other members of the Class have suffered irreparable injury by the transactions complained of herein and are entitled to monetary relief as a result of Defendants' wrongful conduct.

28.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

29.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

30.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

### SeaCube's Prospects for Long-Term Growth Are Excellent

33.     SeaCube purchases intermodal containers and leases them to shipping and transportation companies, both domestically and internationally. Containers include refrigerated and dry freight containers as well as generator sets, which are leased to shipping line customers through a variety of long-term and short-term contractual leasing arrangements.  SeaCube leases three types of assets, refrigerated containers ("reefers"), dry freight containers, and generator sets, which are diesel generators used to provide mobile power to reefers.  The Company leases these assets on a per diem basis on two principal lease types under which the lessee is responsible for all operating costs including taxes, insurance and maintenance: (i) operating leases , typically with initial terms of five to eight years, under which containers are re-leased or returned to SeaCube at expiration of the initial lease; and (ii) direct finance leases , which are typically structured as long-term leases with a bargain purchase option, under which ownership transfers to the lessee at expiration of the lease.

34.     SeaCube has experienced strong earnings and the Proposed Transaction does not reflect the value of SeaCube's financial success and prospects in the price being paid to SeaCube's public stockholders.

35.     On August 6, 2012, SeaCube filed a Form 8-K announcing its results for the second quarter ended June 30, 2012.  Among the highlights of the Company's second quarter performance, the Company announced, *inter alia*, that average utilization was 97.8% for the second quarter and that they had committed to purchase approximately $250 million in equipment for delivery through September 2012, 68% of which had already been committed to long-term leases.  Specifically, the Company announced,

> Adjusted net income was $13.3 million for the second quarter of 2012 compared to $10.4 million in the second quarter of 2011, an increase of 28%. For the second quarter of 2012, adjusted net income per diluted common share was $0.66. The Company focuses on adjusted net income because it excludes the impact of non-cash interest expense and non-recurring items that are unrelated to the operating performance of the business.

Total revenue was $49.4 million for the second quarter of 2012 compared to $40.8 million for the second quarter of 2011, an increase of 21%. Utilization continued to be strong with average second quarter utilization of 97.8%. Adjusted EBITDA was $71.0 million for the second quarter of 2012 compared to $60.8 million in the second quarter of 2011.

The Company reported net income of $11.8 million for the second quarter of 2012 compared to $8.3 million for the second quarter of 2011. Net income per diluted common share was $0.58 for the second quarter of 2012 compared to $0.41 for the second quarter of 2011.

36. In reporting these positive earnings, Defendant Kwok touted the Company's results and the continued investments being made by the Company in its lines of business. Specifically, he stated:

During the second quarter, SeaCube generated strong financial and operational results for stockholders. Year to date, we have committed to invest approximately $250 million. Consistent with our goal of maintaining significant contractual revenue streams, approximately 68% of these containers have already been committed to long-term leases. We expect these investments to continue to positively impact our revenue, earnings and cash flows.

During the second quarter, we took proactive steps to increase our capital available to invest. Specifically, we completed a $225 million offering of "A" rated Fixed Rate Secured Notes and increased our container revolving credit facility to $150 million. With our increased capital availability, we intend to continue pursuing attractive investment opportunities that meet our investment criteria.

Based on SeaCube's strong and stable results, the Board increased the dividend for the fifth time since going public. SeaCube has now increased its dividend 45% since October 2010 for a cumulative payout of $1.95 per share.

37. The Company's results in the second quarter of 2012 continued to impress with adjusted net income increasing by 31% and total revenue increasing by 27% in comparison to the same period in 2011. Specifically, the Company stated:

Adjusted net income was $25.8 million for the six months ended June 30, 2012 compared to $19.6 million for the six months ended June 30, 2011, an increase of 31%. For the six months ended June 30, 2012, adjusted net income per diluted common share was $1.27.

- 10 -

Total revenue was $98.5 million for the six months ended June 30, 2012 compared to $77.6 million for the six months ended June 30, 2011, an increase of 27%. Adjusted EBITDA was $141.5 million for the six months ended June 30, 2012 compared to $113.6 million for the six months ended June 30, 2011.

The Company reported net income of $23.2 million for the six months ended June 30, 2012 compared to $18.4 million for the six months ended June 30, 2011. Net income per diluted common share was $1.14 for the six months ended June 30, 2012 compared to $0.91 for the six months ended June 30, 2011.

38. The Company also announced that they would be continuing the trend of steadily raising the Company's dividend thereby rewarding its stockholders. The Company's Board approved and declared a $0.29 per share cash dividend on its issued and outstanding common shares, an increase of 3.6% from the prior quarter. The Board had previously approved a dividend of $0.26 per share on February 29, 2012 and a dividend of $0.28 per share on May 7, 2012.

39. On November 6, 2012, the Company filed its 10Q for the third quarter of 2012 which reflected on the Company's strong growth. As the table below illustrates, SeaCube has experienced steady growth since its initial public offering ("IPO") on October 27, 2010:

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| **Revenues:** | | | | |
| Equipment leasing revenue | $ 30,754 | $ 28,726 | $ 90,707 | $ 75,444 |
| Finance revenue | 16,213 | 13,945 | 49,102 | 40,281 |
| Other revenue | 2,531 | 2,558 | 8,147 | 7,089 |
| **Total revenues** | 49,498 | 45,229 | 147,956 | 122,814 |
| **Expenses:** | | | | |
| Direct operating expenses | 1,306 | 2,092 | 4,134 | 4,341 |
| Selling, general and administrative expenses | 5,949 | 5,996 | 18,158 | 17,641 |
| Depreciation expenses | 13,328 | 12,242 | 39,485 | 33,159 |
| Provision for doubtful accounts | 224 | 180 | 894 | 220 |
| Impairment of leasing equipment held for sale | 536 | 539 | 1,946 | 904 |
| Interest expense, including non-cash interest of $1,420, $2,320, $4,031 and $3,559, respectively | 17,763 | 15,424 | 51,370 | 39,283 |
| Interest income | (71) | (68) | (209) | (211) |
| Other expenses (income), net | (949) | 6 | (2,268) | 438 |
| **Total expenses** | 38,086 | 36,411 | 113,510 | 95,775 |
| Income before provision for income taxes | 11,412 | 8,818 | 34,446 | 27,039 |
| Provision (benefit) for income taxes | — | 35 | (127) | (142) |
| **Net income** | $ 11,412 | $ 8,783 | $ 34,573 | $ 27,181 |
| **Net income per common share** | | | | |
| Basic | $ 0.56 | $ 0.44 | $ 1.71 | $ 1.35 |
| Diluted | $ 0.56 | $ 0.44 | $ 1.71 | $ 1.35 |
| **Dividend per common share** | $ 0.29 | $ 0.24 | $ 0.83 | $ 0.68 |

40.  Furthermore, the Company has noncancelable operating leases for its leasing equipment from which it generates its revenue.  As the tables below illustrate, the future minimum lease revenue and the receivables under the direct finance leases are estimated to grow substantially:

**Equipment Leasing Revenue**

| | |
|---|---:|
| 2012 | $    25,590 |
| 2013 | 93,536 |
| 2014 | 78,297 |
| 2015 | 68,659 |
| 2016 | 52,112 |
| Thereafter | 79,556 |
| | $   397,750 |

**Finance Revenue**

| | Total Lease Receivables | Unearned Lease Income | Net Lease Receivables |
|---|---:|---:|---:|
| 2012 | $    47,004 | $    15,574 | $    31,430 |
| 2013 | 184,020 | 54,447 | 129,573 |
| 2014 | 200,021 | 40,530 | 159,491 |
| 2015 | 119,898 | 25,967 | 93,931 |
| 2016 | 102,897 | 21,411 | 81,486 |
| Thereafter | 190,439 | 33,744 | 156,695 |
| | $   844,279 | $   191,673 | $   652,606 |

41.  As reflected by SeaCube's recent press releases, financial results, and management comments, the Company's long-term prospects are improving and it is well-positioned for continued future growth.  The Proposed Transaction does not reflect the value of SeaCube's financial success and prospects in the price being paid to its stockholders.

**Fortress' Longstanding Investment in SeaCorp**

42.  In 2006, Fortress, through an affiliate, acquired Container Leasing International, LLC (d/b/a SeaCube Containers, LLC),  the entity through which SeaCube conducts all operations.  SeaCube was later incorporated by an affiliate of Fortress in Bermuda in 2010.  Prior

to SeaCube's initial public offering ("IPO"), Fortress controlled 96.7% of the Company with management and other stockholders holding the balance.

43.     On October 27, 2010, Fortress took SeaCube public, raising $109.25 million through a primary and secondary sale of 10,925,000 shares priced at $10.00 per share.  Fortress subsequently sold a portion of its shares, reducing its ownership stake in the Company from 96.7% to approximately 47%.  Fortress has continued to monetize its equity stake in the Company, reducing its position to 42% as of January 30, 2013.

**The SeaCube Board Is Comprised Almost Entirely of Fortress Loyalists**

44.     While Fortress is no longer the majority stockholder of the Company, Fortress remains SeaCube's largest stockholder and retains significant influence and control over the SeaCube Board.  In fact, a majority of the members of the SeaCube Board are either employees of Fortress or individuals with longstanding intimate ties with Fortress.  Specifically, two members of the Board, Defendants Adams and Defendant Atkeson, are managing directors at Fortress and Defendant Kwok is also the Chairman of a Fortress affiliate, SeaCastle, Inc., where he served as CEO prior to becoming CEO of SeaCube.

45.     Two additional members of the Board have simultaneously served as directors for affiliates of Fortress.  Since October 2009, Defendant Goodwin has been a member of the board at RailAmerica, Inc., which Fortress acquired in 2007 and only recently sold in October 2012. Similarly, Defendant Hacker has been a director at Aircastle Limited, an affiliate of Fortress, since August 2006.  A fifth director, Martin Tuchman, co-founded Interpool, Inc., a business which he sold to funds affiliated with Fortress in 2007.

46.     Although Fortress is not technically the majority stockholder, it has clearly stacked the Board in its favor and maintains a disproportionate degree of influence over the Board.

**SeaCube Improperly Favored a Quick Sale Over Pursuit of
Long-Term Growth Strategies and Hired Two Conflicted Financial Advisors**

47.     In order to meet their duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for themselves.  Due to the Individual Defendants' eagerness to enter into a quick transaction, they failed to implement a fair process and consider all strategic alternatives to obtain the best price for SeaCube stockholders.

48.     Throughout the first half of 2012, the Board and Company management lauded themselves regarding the Company's strong potential for growth, given, *inter alia*, the increase in the Company's borrowing capacity under its credit facilities, and improved liquidity, which resulted in an increased ability to invest in new container assets and pursue new growth opportunities.  The Board also noted the corresponding significant spike in the Company's stock price, which traded as high as $19.00 per share on May 1, 2012, a significant premium to the $10.00 per share IPO price.

49.     The Proposed Transaction was driven by the desire for profit on the part of two primary factions : (i) SeaCube's Fortress-led Board and (ii) Defendant Kwon and certain Company management.  While the Board was eager to achieve a liquidity event for their own self-serving benefit, Defendant Kwon and certain Company management sought to capitalize on the opportunity, negotiating a lucrative employment and equity deal.

50.     Despite the Company's strong position for growth, on August 23, 2012, the Board invited BofA Merrill Lynch and Deutsche Bank to discuss the Company's strategic alternatives.  Notwithstanding that stockholders were poised to enjoy the benefits of their investment, after further discussions on September 13, 2012, the Board decided to explore a sale of the Company.

51.     The Preliminary Proxy is silent as to whether the Board ever considered any strategic alternative other than the sale of the Company.  The Preliminary Proxy is also silent as to whether the Board ever continued to consider remaining a standalone company.

52.     Having decided to "explore" a sale, the Board debated whether they should engage BofA Merrill Lynch or Deutsche Bank, as each had a plethora of conflicting relationships and past and present engagements involving the Company and its affiliates.  Conveniently, both BofA Merrill Lynch and Deutsche Bank had already informed Company management they would be willing to assist and provided fee proposals.  Despite the conflicts, the Board decided to engage both BofA Merrill Lynch and Deutsche Bank.  The Board then passed the reins to Company management to develop a list of potential buyers with the financial advisors.

53.     BofA Merrill Lynch and Deutsche Bank began contacting potential buyers in late September.  Numerous potential buyers indicated interest, including Ontario.  By early December,  potential buyers identified in the Preliminary Proxy as "Bidder A", "Bidder B", and "Bidder C" submitted a preliminary indication of interest, with Ontario also indicating they contemplated retaining certain members of Company management.

54.     After meeting on December 11, 2012, the Board selected Ontario, Bidder A, and Bidder B for the final round of the sales process.  The Board also authorized Kwok and Company management to negotiate continued employment and investment opportunities with Ontario.

55.     In December, Defendant Kwok and certain Company management presented to potential buyers on behalf of the Company and its stockholders while simultaneously vigorously pursuing employment and equity negotiations exclusively with Ontario. Indeed, Defendant Kwok devoted himself to negotiating on behalf of himself and certain Company management. On December 24, 2012, representatives of Ontario sent Defendant Kwok draft letter agreements

proposed to be entered into with certain members of Company management. By January 4, 2013, Defendant Kwon informed the Board he had spoken with several representatives at Ontario regarding future employment, as had other certain members of Company management. Defendant Kwok met yet again with Ontario on January 8, 2013 to further negotiate the continued employment of Defendant Kwok, Bishop, and Leach, and the terms of their investments in the equity of the post-acquisition company.

56.     Ontario and Bidder A submitted final offer letters on January 10, 2013. Bidder B informed the Board it would submit an offer letter at the end of January, if not later. Ontario's offer letter, which expired at 12:00pm *the next day*, set out multiple terms, including a 15-day exclusivity period and consent to negotiate with an affiliate of Deutsche Bank, one of the lenders from whom Ontario sought to seek consent in connection with a credit agreement related to the amalgamation.

57.     The Board consented to Ontario's offer terms, providing Ontario the luxury of a 15-day exclusivity period over which time legal counsel was able to resolve outstanding issues. This also provided Defendant Kwok additional time to finalize a new employment and equity contract. Indeed, on January 15, 2013, Defendant Kwok and certain Company management engaged outside counsel to assist in the negotiation of letter agreements.

58.     The Preliminary Proxy is silent as to whether the Board, having run a sales process and a market check, considered whether stockholder value would be maximized by continuing as a standalone company. Notwithstanding the Board's duty to maximize stockholder value, the Fortress-led Board's goal of liquidity would be achieved. On January 18, 2013, BofA Merrill Lynch and Deutsche Bank, both of whose fees in connection with the Proposed Transaction were solely contingent upon consummation of the acquisition, presented fairness opinions to the Board, after which the Board approved the Proposed Transaction.

**The Structure of the Proposed Transaction Unfairly Deters Competitive Offers**

59.     The structure of the Proposed Transaction unreasonably and unfairly restricts the Company from soliciting competitive offers for the Company and eliminates a market check on Ontario's offer.

60.     Concurrently with the execution of the Amalgamation Agreement, on January 18, 2013, Seacastle Operating, an affiliate of Fortress, entered into the Voting Agreement with respect to approximately 42% of the outstanding shares of SeaCube's common stock.  As a result, the Proposed Transaction will almost definitely be consummated as it only requires a majority of outstanding shares to vote to approve the Proposed Transaction.

61.     Even without considering the effect of the Voting Agreement in locking up the Proposed Transaction, the Amalgamation Agreement features several oppressive provisions that work to preclude other bidders from stepping forward with a superior alternative offer.  By entering into the coercive Amalgamation Agreement and failing to protect the interests of SeaCube's public stockholders, the Individual Defendants have breached their fiduciary duties.

62.     First, the Board entered into an Amalgamation Agreement that includes a "No Solicitation Provision."  The No Solicitation Provision impairs the ability of the SeaCube Board to secure an offer that captures the inherent value of the Company and adequately compensates SeaCube's public stockholders for their ownership interest in the Company.  Specifically, Section 5.4(a) of the Amalgamation Agreement states that SeaCube and its representatives shall not, among other things, directly or indirectly: (i) solicit, initiate or knowingly encourage or take any other action to knowingly facilitate the submission of any proposal that constitutes or is reasonably likely to lead to a Takeover Proposal;  (ii) engage in discussions or negotiations with, or furnish or disclose any non-public information relating to the Company or any of its Subsidiaries to, any Person that has made or indicated an intention to make a proposal that

constitutes or is reasonably likely to lead to a Takeover Proposal;  (iii) withdraw, modify or amend the Company Board Recommendation in any manner adverse to Parent;  (iv) approve, endorse or recommend any proposal that constitutes or is reasonably likely to lead to a Takeover Proposal; or  (v) enter into any agreement in principle, arrangement, understanding or Contract relating to a proposal that constitutes or is reasonably likely to lead to a Takeover Proposal.

63.     Second, according to Section 5.4(c) of the Amalgamation Agreement, in the event the Company receives a Takeover Proposal or any request for information or inquiry that the Company reasonably believes could lead to or contemplates a Takeover Proposal, SeaCube must notify Ontario orally and in writing within 24 hours of the material terms and conditions of the Takeover Proposal, request or inquiry and the identity of the person making any such Takeover Proposal, request or inquiry.  Furthermore, SeaCube must keep Ontario reasonably informed of the status and material details of any such Takeover Proposal, request or inquiry.

64.     Third, pursuant to Section 5.4(d), only in response to a bona fide written Takeover Proposal, is the Company permitted to engage in discussions or disclose any non-public information relating to the Company or any of its Subsidiaries, with the person or entity who has made such Takeover Proposal and even then, only if the Company Board determines in good faith that such Takeover Proposal constitutes, or is reasonably likely to result in, a Superior Proposal and, that engaging in such discussions or negotiations is necessary in order for the Company Board to comply with its fiduciary duties under applicable Law.  Moreover, the Company must concurrently provide OTPC with any material nonpublic information that is made available to any competing buyer.

65.     Fourth, even should the Company receive a superior offer, the Company Board can't endorse or recommend the proposal or terminate the Amalgamation Agreement until after four business days following Ontario's receipt of written notice from the Company advising

Ontario that the Company Board intends to take such action and specifying the reasons therefor, including the material terms and conditions of the superior proposal. During the four business day period, the Company must negotiate with Ontario to allow them to top any other superior proposal, all the while with full and intimate knowledge of all the details of the competing offer.

66.     Lastly, pursuant to Section 7.6 of the Amalgamation Agreement, Defendants agreed to a termination fee requiring SeaCube to pay a fee of $15.5 million in the event that SeaCube accepts a superior competing proposal (the "Termination Fee") further precluding the possibility of another suitor bidding for the Company.

67.     The Individual Defendants have the duty to act independently so that the interests of its stockholders will be protected, but the Individual Defendants have failed in their duty by not even forming a special disinterested committee for purposes of determining the fairness of the Proposed Transaction. The preferential treatment shown to the Fortress Insiders and Ontario by the Individual Defendants has deprived Plaintiff and SeaCube's public stockholders of a fair value for their shares.

68.     The Proposed Transaction lacks any of the fundamental hallmarks of fairness. The acts conducted above effectively preclude any other bidders who might be interested in paying more than Ontario for the Company, and has the effect of foreclosing the ability of the Plaintiff and the Company's public stockholders to obtain the best price for their shares and forces them into a change of control transaction with Ontario.

69.     Accordingly, the Proposed Transaction is wrongful, unfair and harmful to the Company's public stockholders, and represents an attempt to deny Plaintiff and the other members of the Class their right to obtain their fair proportionate share of the Company's valuable assets, growth in profits, earnings and dividends.

**SeaCube Insiders, Including the Individual Defendants, Receive**
**Special Benefits Not Available to Plaintiff and Other Class Members**

70.     Because the Individual Defendants dominate and control the business and corporate affairs of SeaCube and have access to material, non-public information concerning SeaCube's financial condition and business prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of SeaCube.  Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any acquisition under which they will reap disproportionate benefits to the exclusion of obtaining the best shareholder value reasonably available.  Nonetheless, the Proposed Transaction represents an effort by the Individual Defendants to aggrandize their own financial position at the expense of and to the detriment of the Class by denying the Class members their stockholder rights by selling SeaCube via an unfair process and at an inadequate price.  Accordingly, the Proposed Transaction will benefit the Individual Defendants at the expense of Plaintiff and SeaCube's public stockholders.

71.     Rather than negotiate a transaction that was in the best interests of SeaCube's public stockholders, the Company's management and Board are acting to better their own personal interests through the Proposed Transaction as evidenced by the Company's Form 8-K, filed with the SEC on January 23, 2013, and the Preliminary Proxy.

72.     The above-mentioned Form 8-K states that on January 18, 2013 (the same day of the Amalgamation Agreement), the Board approved the terms of and adoption of the Company's Key Employee Severance Plan ("Severance Plan"), which applies to executives and certain other key employees of the Company.  Each of the Company's named executive officers, Defendant Kwok, Bishop, and Leach, is a participant in the Severance Plan.  The Severance Plan provides that if a participant's employment is terminated within two years following the closing of the Amalgamation Agreement ("Closing"), other than for death or disability, by the Company

without "cause" or by the participant for "good reason" (as such terms are defined in the Severance Plan), the participant will be entitled to receive (i) a lump sum cash severance payment; (ii) a lump sum cash payment equal to COBRA premium cost for the amount of time remaining in the two-year period following the change in control; *and* (iii) accelerated vesting of unvested Restricted Shares.

73.    The "lump sum cash payment" mentioned in the Severance Plan would equal the sum of (i) two times (in the case of Defendant Kwok) or one and a half times (in the case of Bishop and Leach) the sum of (A) the participant's base salary *and* (B) their prior annual bonus and (ii) an amount equal to the prior annual bonus pro-rated for the year in which the severance event occurs.

74.    As stated herein, Defendant Kwok will materially benefit by being named a Tier I participant in the Severance Plan.  Defendant Kwok will also be granted options to purchase shares of common stock of the newly-formed company covering 33.75% of the option pool to be established.  At Closing, Defendant Kwok's annual base salary will be raised to $425,000 and the target for his annual performance bonus will be anywhere from 100% to 175% of his base salary.  Pursuant to a letter agreement with SeaCube and Acquisition Sub, dated January 18, 2013, Defendant Kwok has agreed to enter into a subscription agreement before the Closing. Under the subscription agreement, Kwok will make an equity investment of $2.25 million in the combined company.

75.    As stated herein, Bishop will materially benefit by being named a Tier II participant in the Severance Plan.  Bishop's annual base salary will be raised to $315,000 following the Closing, and the target for his annual performance bonus will be anywhere from 50% to 75% of his base salary.  Bishop is also a party to a letter agreement with SeaCube and Acquisition Sub, dated January 18, 2013.  Under this letter agreement, six months after the

Closing, Bishop's employment is expected to be terminated without "cause."  Once he is terminated without cause, Bishop will be entitled to his severance benefits under the Severance Plan.

76.     Under a letter agreement with SeaCube and Acquisition Sub, dated January 18, 2013, Leach's annual base salary will be $228,000 and the target for her annual performance bonus will be anywhere from 50% to 75% of her base salary.  Leach will be granted options to purchase shares of common stock of the newly-formed company covering 7.5% of the option pool to be established.  Leach will also receive a $100,000 bonus with respect to the Proposed Transaction provided that she remains with the Company through the Closing.  Finally, Leach has agreed to enter into a subscription agreement before the Closing.  Under the subscription agreement, Leach will make an equity investment of $500,000 in the combined company.

77.     Defendant Kwok, Bishop, and Leach are subject to Golden Parachute Compensation.  Some of the compensation will be payable upon consummation of the Proposed Transaction, while other compensation will be payable only if the Executive is terminated in connection with the Proposed Transaction.  The exact amount of Golden Parachute Compensation has not yet been disclosed.

78.     None of these material benefits available to Defendant Kwok, Bishop, and Leach are available to SeaCube's public stockholders.

79.     All of SeaCube's executive officers, and some its directors, hold Restricted Shares granted under SeaCube's equity incentive plan.  These restricted shares will be subject to accelerated vesting upon Closing.

80.     Defendant Goodwin, Defendant Hacker, and Defendant Hamm each hold 10,000 restricted shares.  Defendant Tuchman holds 13,698 restricted shares.  As a result of these holdings, Defendant Goodwin, Defendant Hacker, and Defendant Hamm will *each* receive

$230,000 if the Proposed Transaction is consummated. Defendant Tuchman will receive $315,054 if the Proposed Transaction is consummated.

81. Defendant Kwok, Bishop, and Leach also hold Restricted Shares, though the exact number has not yet been disclosed. As a result, Defendant Kwok, Bishop, and Leach also stand to personally gain if the Proposed Transaction is approved, though the exact amount by which they stand to benefit has not yet been disclosed.

82. None of these material benefits available to Defendant Kwok, Bishop, Leach, Defendant Goodwin, Defendant Hacker, Defendant Hamm, and Defendant Tuchman are available to SeaCube's public stockholders.

83. As a result of Defendants' unlawful actions, Plaintiff and the other members of the Class will be damaged in that they will not receive their fair portion of the value of the Company's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

84. Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, aided and abetted by OTPC and the Principal Stockholders, to the irreparable harm of Plaintiff and the Class.

85. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

**Defendants Filed a Materially False and Misleading Preliminary Proxy Statement**

86. To make matters worse, on January 30, 2013, the Company filed its Preliminary Proxy with the SEC and disseminated it to the Company's public stockholders in an attempt to convince stockholders to vote in favor of the Proposed Transaction. It is critical that stockholders receive complete and accurate information about the Proposed Transaction. To

date, Defendants have failed to provide the Company's stockholders with that information. As set forth in more detail below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process for the Company; (b) details concerning the involvement of BofA Merrill Lynch and Deutsche Bank with SeaCube; and (c) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinions" provided by SeaCube's financial advisors, BofA Merrill Lynch and Deutsche Bank.

**The Preliminary Proxy Fails to Adequately Describe the
Process and Background That Resulted in the Proposed Transaction**

87.     The Preliminary Proxy fails to fully and fairly disclose certain material information concerning the Proposed Transaction, including (among other things):

(a)     On page 24, the Preliminary Proxy states that BofA Merrill Lynch and Deutsche Bank met with the SeaCube Board on August 23, 2012, to discuss "strategic opportunities" available to the Company. The Preliminary Proxy fails to describe, other than a potential sale, what strategic opportunities were available or discussed. This omission is material. Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value and whether other bidders may be willing to pay more for the Company;

(b)     On page 24, the Preliminary Proxy states that BofA Merrill Lynch and Deutsche Bank met with the SeaCube Board on August 23, 2012, and included a potential sale of SeaCube among the strategic opportunities available to the Company. The Preliminary Proxy fails to describe the reasons that the financial advisors were proposing a sale, particularly in light of the Company's strengthening financial performance. This omission is material. Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value and whether other bidders may be willing to pay more for the Company;

(c)     On page 25, the Preliminary Proxy states that the Board and Company management discussed the Company's business plan, industry trends, and the potential for increasing stockholder value by implementing the Company's business initiatives.   The Preliminary Proxy fails to describe the Company's business plan, fails to describe the relevant industry trends, and fails to describe the Company's business initiatives that would potentially increase stockholder value.   This omission is material.   Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value and whether other bidders may be willing to pay more for the Company;

(d)     On page 25, the Preliminary Proxy states that Company management, with the assistance of its two investment banks, developed a list of potential strategic and financial buyers.   The Preliminary Proxy fails to describe the process or criteria used to develop this list. This omission is material.   Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(e)     On page 25, the Preliminary Proxy states that a Company representative met with Bidder C on September 21, 2012, and that Bidder C had been previously identified as a potential buyer of the Company.   The Preliminary Proxy fails to describe when Bidder C first became interested in the Company, the terms of the proposal (if any) Bidder C had previously made for the Company, and the result of Bidder C's proposal (if any).   This omission is material. Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(f) On page 26, the Preliminary Proxy states that Ontario and Bidder C requested to proceed on "an expedited basis," but fails to describe the reasons that each of these entities desired to proceed on an expedited basis. This omission is material. Providing the omitted information to stockholders will help them assess whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(g) On page 27, the Preliminary Proxy states that, of the 32 potential buyers that had been contacted, ten had signed confidentiality agreements. The Preliminary Proxy fails to indicate how many of these ten buyers were financial buyers and how many were strategic buyers. This omission is material. Providing the omitted information to stockholders will help them assess whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(h) On page 27, the Preliminary Proxy states that the Board invited Ontario and Bidder B to the final round of the sales process. However, the Preliminary Proxy fails to describe the Board's process and reasons for selecting Bidder B over Bidder C, particularly where Bidder C had offered $22.00 a share and Bidder B had offered a range of $21.00 to $22.00 a share. This omission is material. Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(i) On page 27, the Preliminary Proxy states that the Board informed Bidder C that it needed to raise its price to advance to the final round. The Preliminary Proxy fails to explain the reasons that the Board considered Bidder C's $22.00 offer inferior to Bidder B's offer of $21.00 to $22.00, and fails to explain the reasons that the Board was requiring Bidder C to raise its offer. This omission is material. Providing the omitted information to stockholders

will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(j)    On page 27, the Preliminary Proxy states that the Board invited Ontario and Bidder B to the final round of the sales process, and authorized Company management to communicate directly with Ontario regarding the proposed terms of their continued employment and investment in the combined company.  The Preliminary Proxy fails to describe the reasons that the Board authorized Company management to communicate directly with Ontario before the Company had received final bids.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(k)    On page 27, the Preliminary Proxy states that the Board invited Ontario and Bidder B to the final round of the sales process, and authorized Company management to communicate directly with Ontario regarding the proposed terms of their continued employment and investment in the combined company.  The Preliminary Proxy fails to describe whether the Board authorized Company management to communicate directly with Bidder B, or any other bidders.  If the Board did not authorize direct contact with Bidder B, or any other bidders, the Preliminary Proxy fails to explain the reasons that the Board favored Ontario over Bidder B and any other bidders.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(l)    On page 28, the Preliminary Proxy states that Company management gave presentations to Ontario, Bidder A, and Bidder B, and that after the presentation to Ontario in New York, Company management met with Ontario representatives to discuss the terms of

continued employment and potential investment by Company management in the combined company. The Preliminary Proxy fails to explain whether Company management met with representatives of Bidder A or Bidder B after the presentations. If Company management did not meet with representatives of Bidder A or Bidder, the Preliminary Proxy fails to provide the reasons that Company management only met with Ontario representatives to discuss the terms of continued employment and investment in the combined company. This omission is material. Providing the omitted information to stockholders will help them assess whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(m)     On page 30, the Preliminary Proxy states that Bidder A's offer would contemplate that a majority of its consideration would be in the form stock. The Preliminary Proxy fails to describe the industry in which Bidder A operated, the financial strength of Bidder A, or the stability and/or outlook of Bidder A's stock price. This omission is material. Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube

(n)     On page 30, the Preliminary Proxy states that Bidder A provided a "high-level issues list which lacked specificity." The Preliminary Proxy fails to describe, even generally, the high-level issues identified by Bidder A. This omission is material. Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value and whether other bidders may be willing to pay more for the Company;

(o)     On page 31, the Preliminary Proxy states that Ontario's offer did not include any "burdensome conditions" but fails to describe what it would have considered to be "burdensome conditions." This omission is material. Providing the omitted information to

stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(p)     On page 31, the Preliminary Proxy states that the Board instructed its investment banks that Ontario needed to raise its offer price and permit the Company to continue to pay its regularly scheduled quarterly dividend.  The Preliminary Proxy fails to describe the value of this dividend to SeaCube stockholders.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(q)     On page 32, the Preliminary Proxy fails to explain the reasons that the Board agreed to accept Ontario's prohibition on the Company paying its regular quarterly dividend for the quarter ended December 31, 2012.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(r)     On page 32, the Preliminary Proxy states that Ontario would allow the Company to pay its regularly scheduled quarterly dividend with respect to the quarter ended March 31, 2012.  The Preliminary Proxy fails to describe the value of this dividend to SeaCube stockholders.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be

willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(s)     On page 32, the Preliminary Proxy fails to describe the basis for raising the appraisal condition from 5% of stockholders to 8% of stockholders.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube;

(t)     The Preliminary Proxy fails to disclose that Fortress had designated Directors Goodwin, Hacker, Hamm, and Tuchman for election to the Board in accordance with a stockholder agreement between Fortress and SeaCube.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube; and

(u)     The Preliminary Proxy fails to disclose the terms of the subscription agreements, pursuant to which Kwok and Leach will make equity investments of $2.25 million and $500,000, respectively, in the combined company.  This omission is material.  Providing the omitted information to stockholders will help them assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of SeaCube.

**The Preliminary Proxy Fails to Provide Adequate Information**
<u>**Concerning the Company's Financial Advisors**</u>

88. The Company's financial advisors, BofA Merrill Lynch and Deutsche Bank, were retained to render an opinion that the merger price is fair to the stockholders, and to perform the valuation analysis necessary to support that opinion. In light of the materiality of this opinion and analysis to the market and SeaCube's stockholders, it is critical to know any facts that might suggest that either of the financial advisors is conflicted, including the extent of any contingent fee arrangements and previous or current work for any party. The Preliminary Proxy is materially misleading and/or incomplete for failing to disclose:

(a) the work that BofA Merrill Lynch has done for SeaCube and any of its related or affiliated organizations, such as CLI Funding IV LLC or Container Leasing International, LLC, over the last two years, and what fees it has been paid for this work. This omission is material. Providing the omitted information to stockholders will help them assess whether BofA Merrill Lynch was conflicted in rendering its fairness opinion;

(b) the work that Deutsche Bank has done for SeaCube and any of its related or affiliated organizations, over the last two years, and what fees it has been paid for this work. This omission is material. Providing the omitted information to stockholders will help them assess whether Deutsche Bank was conflicted in rendering its fairness opinion;

(c) the amount of financing the Deutsche Bank affiliate might be providing to CLI Funding IV LLC, and what fees the Deutsche Bank affiliate stands to gain from this lending agreement. This omission is material. Providing the omitted information to stockholders will help them assess whether Deutsche Bank was conflicted in rendering its fairness opinion; and

(d) the fees that Deutsche Bank and/or its affiliates received for the work they performed for Container Leasing International, LLC. This omission is material. Providing the omitted information to stockholders will help them assess whether Deutsche Bank was conflicted in rendering its fairness opinion.

**The Preliminary Proxy Fails to Disclose Material Facts Concerning
BofA Merrill Lynch's Fairness Opinion**

89.     In the Definitive Proxy, BofA Merrill Lynch describes its fairness opinion and the various valuation analyses it performed to render its opinion.  However, BofA Merrill Lynch's description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

*Selected Publicly Traded Companies Analysis (pages 38-39)*

90.     The Preliminary Proxy fails to disclose material details concerning the analyses that BofA Merrill Lynch performed in connection with the *Selected Publicly Traded Companies Analysis*.  Among other things, the Preliminary Proxy fails to describe the precise criteria used to select the three analyzed companies.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

91.     The Preliminary Proxy fails to disclose BofA Merrill Lynch's basis for calculating TAL International Group, Inc.'s multiple on a pre-tax basis but calculating the other two companies' multiples on an after-tax basis.  The Preliminary Proxy also fails to disclose the effect of these different methodologies on BofA Merrill Lynch's analysis.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

92.     The Preliminary Proxy fails to disclose BofA Merrill Lynch's basis for deciding to calculate the multiple for TAL International Group, Inc. on a pre-tax basis instead of by way of a normalized tax rate.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

93.     The Preliminary Proxy fails to identify the multiples observed for each of the tree companies, even though the multiples observed for TAL International Group, Inc. were calculated based on pre-tax multiples, while the multiples for CAI International Inc. and Textainer Group Holdings Limited reflect after-tax multiples.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

94.     The Preliminary Proxy states that SeaCube's calendar year 2013 EPS was "adjusted for non-cash interest."  The Preliminary Proxy fails to explain whether BofA Merrill Lynch made this adjustment for the three selected companies.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

95.     The Preliminary Proxy states that SeaCube's calendar year 2013 EPS was "adjusted for non-cash interest," but fails to explain the reasons that BofA Merrill Lynch calculated the EPS in this manner.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

### *Selected Precedent Transactions Analysis (pages 39-40)*

96.     The Preliminary Proxy fails to disclose material details concerning the analyses that BofA Merrill Lynch performed in connection with the *Selected Precedent Transactions Analysis*. Among other things, the Preliminary Proxy fails to describe: (a) the amount of each transaction; (b) whether the transactions involved cash, stock, or both; (c) whether the transactions involved friendly or hostile transactions; and (d) the total assets and market capitalization of each company.  This omission is material.  Without this stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

97.     The Preliminary Proxy fails to disclose the criteria used to select the transactions used in the analysis and the multiples observed for each transaction. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

98.     The Preliminary Proxy states that the multiples for the transactions involving GE SeaCo (in September 2011) and Triton Container International Limited (in February 2011) were not publicly available. The Preliminary Proxy fails to explain the basis for the assertion that the multiples for these two transaction were not publicly available, particularly since in Deutsche Bank's *Selected Precedent Transactions Analysis* there is no indication or disclaimer that the multiples for these two transactions were not publicly available. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

99.     The Preliminary Proxy fails to describe BofA Merrill Lynch's reasons for including eight selected transactions, when only *two* of those eight transactions were used to calculate the high and low multiples. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

100.    The Preliminary Proxy fails to describe BofA Merrill Lynch's reasons for including the transactions involving Transamerica Maritime Containers (November 2004) and Transamerica Leasing Inc. -- N. America Intermodal division (October 2000) when those transactions were completely excluded from the high, low, mean, and median multiples. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

101.    The Preliminary Proxy fails to describe BofA Merrill Lynch's reasons for including an uncompleted transaction in its analysis. This omission is material. Without this information,

stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

102.    The Preliminary Proxy fails to describe BofA Merrill Lynch's reasons for calculating a Price/Book Value in which the mean and median multiples, 1.7x and 1.6x, respectively, are, illogically, *outside* of the high and low multiples of 1.5x and 1.4x, respectively. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

### *Discounted Cash Flow Analysis (page 40)*

103.    The Preliminary Proxy fails to disclose material details concerning the analyses that BofA Merrill Lynch performed in connection with its *Discounted Cash Flow Analysis*. Among other things, the Preliminary Proxy fails to explain how BofA Merrill Lynch arrived at a discount rate of 18.75% to 22.75%. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

### *Other Factors (pages 40-41)*

104.    The Preliminary Proxy states that BofA Merrill Lynch considered the low and high closing prices for SeaCube during the one-year period ended January 17, 2013, but fails to explain how this information suggests the Proposed Transaction is fair. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

105.    The Preliminary Proxy fails to disclose the undiscounted low and high share price targets. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

**The Preliminary Proxy Fails to Disclose Material Facts Concerning Deutsche Bank's <u>Fairness Opinion</u>**

106. In the Definitive Proxy, Deutsche Bank describes its fairness opinion and the various valuation analyses it performed to render its opinion. However, Deutsche Bank's description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

*Selected Publicly Traded Companies Analysis (pages 44-45)*

107. The Preliminary Proxy fails to disclose material details concerning the analyses that Deutsche Bank performed in connection with the *Selected Publicly Traded Companies Analysis*. Among other things, the Preliminary Proxy fails to describe the precise criteria used to select the three analyzed companies. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

108. The Preliminary Proxy fails to provide the multiples observed for each of the three companies. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

109. The Preliminary Proxy states that Deutsche Bank calculated TEV/NBVRA multiples for the selected publicly traded companies. The Preliminary Proxy fails to explain the reasons that Deutsche Bank failed to use these multiples to calculate an implied value range for SeaCube stock, even though it had used the other sets of multiples to calculate corresponding implied value ranges. This omission is material. Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

- 36 -

110.     The Preliminary Proxy states that Deutsche Bank calculated TEV/NBVRA multiples for the selected publicly traded companies.  The Preliminary Proxy fails to explain whether these multiples would have generated an implied value range in which the low-end of the range would have exceed $23.00 a share.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

### *Selected Precedent Transaction Analysis (page 46)*

111.     The Preliminary Proxy fails to disclose material details concerning the analyses that Deutsche Bank performed in connection with the *Selected Precedent Transactions Analysis*.  Among other things, the Preliminary Proxy fails to describe: (a) the amount of each transaction; (b) whether the transactions involved cash, stock, or both; (c) whether the transactions involved friendly or hostile transactions; and (d) the total assets and market capitalization of each company.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

112.     The Preliminary Proxy fails to disclose the criteria used to select the transactions used in the analysis and the multiples observed for each transaction.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

113.     The Preliminary Proxy fails to disclose whether all of the multiples observed for the selected transactions were publicly available.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

### *Discounted Cash Flow Analysis (page 46)*

114.    The Preliminary Proxy fails to disclose material details concerning the analyses that Deutsche Bank performed in connection with its *Discounted Cash Flow Analysis*.   Among other things, the Preliminary Proxy fails to explain how Deutsche Bank arrived at a discount rate of 17.0% to 19.0%.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

115.    The Preliminary Proxy fails to explain the reasons that Deutsche Bank used an unlevered free cash flow instead of a levered cash flow in calculating the discount rates for SeaCube's cost of equity.  Discount rates for unlevered cash flow are based on weighted average cost of capital while cost of equity is based on levered cash flows.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

116.    The Preliminary Proxy states that Deutsche Bank arrived at the terminal values by applying multiples ranging from 8.0x to 10.0x.  The Preliminary Proxy fails to describe how Deutsche Bank arrived at these multiples.  This omission is material.  Without this information, stockholders do not know how much weight to give the fairness opinion and cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion.

## COUNT I

### Claim for Violations of § 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

117.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

118.    Individually and in concert, the Individual Defendants and SeaCube disseminated the false and misleading Preliminary Proxy specified above, which contained statements that, in violation of § 14(a) and Rule 14a-9, in light of the circumstances under which they were made,

omitted to state material facts necessary in order to make the statements therein not materially false or misleading. Among other things, the Preliminary Proxy misrepresented and/or omitted material information about the unfair sales process for the Company (such as the favoritism to Ontario and the conflicts of interests of persons involved in the process), the current and future value of the Company, and information relating to BofA Merrill Lynch and Deutsche Bank's financial analyses and fairness opinions.

119. The Preliminary Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Preliminary Proxy.

120. The Individual Defendants were at least negligent in filing the Preliminary Proxy with these materially false and misleading statements.

121. The omissions and false and misleading statements in the Preliminary Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Preliminary Proxy and in other information reasonably available to stockholders.

122. By reason of the foregoing, the Individual Defendants have violated § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

123. Because of the false and misleading statements in the Preliminary Proxy, Plaintiff and other SeaCube stockholders are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### Claim for Violations of § 20(a) of the Exchange Act

124.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

125.    The Individual Defendants acted as controlling persons of SeaCube within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of SeaCube and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Preliminary Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

126.    Each of the Individual Defendants as controlling persons of SeaCube was provided with or had unlimited access to copies of the Preliminary Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Preliminary Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Preliminary Proxy.

128.    By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

129.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are jointly and severally liable to Plaintiff pursuant to § 20(a) of the Exchange Act.

**COUNT III**

**Claim for Oppression Under Bermuda Companies Act of 1981**

130.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131.     In accordance with Section 111 of the Bermuda Companies Act of 1981, any shareholder who complains that the affairs of a company are being conducted, or that the powers of the directors of a company are being exercised, in a manner oppressive to him or any of the members (including himself), or in disregard of his or their interests as members, may apply to the court for an order under this section.

132.     If, on such application, the court is of the opinion that the company's affairs are being conducted or the directors' powers are being exercised as aforesaid, the court "may, with a view to bringing to an end the matters complained of, make such order as it thinks fit," including enjoining or rescinding the oppressive transaction.

133.     It is unlawful under Bermuda law for directors to disregard the interests of a minority of the member's interests (as members), even where the Proposed Transaction put forward is put forward in good faith, and such disregard will amount to oppression under Bermuda law, and to a remedy against the Board under Bermuda corporate law for their oppressive actions.

134.    Under Bermuda law, courts are provided with the authority to enjoin the sale of a company as oppressive to stockholders where, as here, the Board is attempting to sell the Company at less than fair value, is acting in breach of its duties, and is conflicted in its interests.

135.    As demonstrated by the allegations above, the Individual Defendants have acted in an oppressive manner to the stockholders of SeaCube because, among other reasons:

(a)    they have failed to take steps to maximize the value of SeaCube to its public stockholders;

(b)    they failed to properly value SeaCube and its various assets and operations; and

(c)    they ignored or did not protect against the conflicts of interest resulting from the directors' personal interests in the Proposed Transaction.

136.    Because the Individual Defendants dominate and control the business and corporate affairs of SeaCube, and are in possession of or have access to private corporate information concerning SeaCube's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of SeaCube which makes it inherently unfair and oppressive for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

137.    As a result of the Individual Defendants' oppressive and unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of SeaCube's assets and operations.  Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to act in an oppressive manner to Plaintiff and the members of the Class, will not engage in arm's-length

negotiations on the Proposed Transaction terms, and may consummate the Proposed Transaction, all to the irreparable harm of the members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and demands judgment against Defendants as follows:

A.  Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the representative of the Class;

B.  Declaring and decreeing that the Amalgamation Agreement is unlawful and unenforceable;

C.  Declaring and decreeing that Defendants have acted and are acting in an oppressive manner to the Company's stockholders;

D.  Directing that the Company and Individual Defendants cure the material deficiencies in the Preliminary Proxy by providing full and fair disclosure to stockholders;

E.  Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until Defendants disclose all material information;

F.  Declaring that the Defendants herein, and each of them, have violated §§14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

G.  In the event that the Proposed Transaction is consummated, rescinding it and setting it aside, or awarding rescissory damages to the Class;

H.  Imposition of a constructive trust, in favor of Plaintiff and members of the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

I.      Awarding Plaintiff and the Class such damages as may be proved at trial including pre- and post-judgment interest and attorneys' fees for the benefits produced for SeaCube stockholders;

J.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

K.      Granting such other and further equitable relief as this Court may deem just and proper.

<table>
<tr><td></td><td>Respectfully Submitted</td></tr>
<tr><td></td><td>THE ROTHENBERG LAW FIRM LLP</td></tr>
<tr><td>Dated: February 12, 2013</td><td>By: /s/ Daniel Breen, Esquire</td></tr>
</table>

                                        Daniel Breen, Esquire
                                        THE ROTHENBERG LAW FIRM LLP
                                        Tarragon Executive Offices
                                        811 Church Road, Suite 222
                                        Cherry Hill, NJ 08002

**OF COUNSEL:**
Richard A. Acocelli
Michael A. Rogovin
WEISSLAW LLP
1500 Broadway, 16th Floor
New York, NY 10036
Tel:    (212) 682-3025
Fax:    (212) 682-3010